Lewis L. Delafield,
Referee.—[After stating some preliminaries not necessary to notice here.]—It appears from the evidence that Mr. Ferdinand S. Hahn was admitted to the bar as attorney and counselor in June, 1875.
From about June, 1878, to the period hereinafter stated, he was employed by one Louis Levinson as his counsel in many actions and matters, and as such earned a considerable amount of fees from, and made certain disbursements for his client. Mr. Levinson neglected to pay him what was due, and from time to time put him off with excuses and promises, or small sums on account.
Prior to October 16, 1879, Mr. Hahn considered Levinson indebted to him in about the sum of $700, and called upon him to pay that amount.
On October 16, 1879, Levinson was brought to the office of Mr. Hahn by Mr. McGtonigle, a deputy sheriff, under arrest in an action by the Manufacturers’ and Merchants’ Bank against Louis Levinson. Mr. Hahn re *425 fused to act as his counsel unless Levinson first paid his bill of $700, but was at length induced to defend him, by promises that his bill should be paid before any others. Mr. Hahn accompanied Levinson to his store, and there received a retainer of $50 and a package of letters and papers. Levinson was imprisoned in Ludlow street jail.
Upon examining the papers intrusted to him by Levinson, Mr. Hahn became firmly and fully convinced that Levinson was guilty as charged by the bank; that he was a perjurer and a forger, and the only doubt upon his mind was how much of the money taken from the bank had been received by Levinson, and how much by his co-conspirator Hawes.
Among the papers received by Mr. Hahn from Levinson were one hundred and twenty-two original letters, written by J. P. Hawes to Louis Levinson, of which about ninety-six were put in evidence by the counsel for. the Bar Association. This Hawes was a book-keeper in the Manufacturers’ and Mechanics’ Bank, and was charged by the bank with having conspired with Louis Levinson to aid”him in drawing from the bank some $38,000 over and above his deposits there. The letters are of such a character as to justify the conviction which Mr. Hahn says he felt, that Levinson was guilty as charged by the bank.
Mr. Hahn entered energetically into the defense of his client. On October 16, 1879, he retained Messrs. Martin & Smith as counsel, and between that date and November 6, next, had several consultations with Mr. A. P. Whitehead, of that firm, in regard to a motion to vacate the order under which Levinson had been arrested. For that purpose, Mr. Hahn says, he gave Mr. Whitehead sixteen of these letters, written by Hawes to Levinson. Mr. Whitehead considered them very damaging, and advised that the motion be made upon the plaintiff’s papers because, to use his *426 language, otherwise “Mr. Levinson must of necessity . have exposed his case in such a way, that it would, have been fatal to a defense on the trial. The motion was accordingly made on October 24, and the letters were not used. Mr. Whitehead thinks that these letters while in his custody, were kept in a safe in a room adjoining his, where he kept all valuable papers. He has no reason to. think that the letters were abstracted or copied while in his possession, and there is no pretense that they were.
Mr. Whitehead returned the letters in his possession to Mr. Hahn about November 6, 1879. Mr. Hahn also consulted Mr. Whitehead as to the propriety of Levinson making a general assignment, and was informed that it was unnecessary and inadvisable. This opinion coincided with Mr. Hahn’s views, and Levinson was advised accordingly.
Down to .this time friendly relations existed between Mr. Hahn and Levinson, and the former visited him at the jail once or twice daily.
Mr. Hahn kept the letters in a safe in his office, of which he only had the key, and he manifested, by what he .testifies he said to Mr. Whitehead, his appreciation of their importance and the necesity of keeping them secret. Mr. Hahn had copies of all these letters made by one Wehrman, his clerk, about the time that Mr. Whitehead was consulted on the motion to vacate, and these copies he also kept in his safe. There is evidence tending to show that the knowledge of the existence of letters between Levinson and Hawes had crept out, and that as early as the end of October newspaper reporters applied to Mr. Hahn for an inspection of such letters, which he refused, and denied their existence.
On his visit to the jail on November 1,1879, Levinson informed Mr. Hahn that Mr. Richard A. Newcombe, an attorney of this court, had on that morning called *427 upon Mm at the jail in company with one Seemer, a creditor of Levinson, and induced him first to confess judgment in favor of said Seemer, and then to execute an assignment preferring all his creditors except the Manufacturers’ and Merchants’ bank and Mr. Hahn. At the same interview Levinson ipstructed Mr. Hahn to drop Messrs. Martin & Smith as counsel, and to retain Mr. Cardozo.
Mr. Hahn denounced the proceedings with indignation and refused to have anything to do with Messrs. Cardozo and Newcombe. He demanded payment of his bill, and declined all further connection with Levinson.
Some days after Mrs. Levinson called on Mr. Hahn and persuaded him to reduce his bill, which was then about $1,000, to $575. This gracious act was followed by a letter from Mr. Newcombe, dated November 6, 1879, offering $50, in addition to the $75 and $250 which the writer incorrectly said had already been paid to Mr. Hahn. The only payment to Mr. Hahn in this matter appears to have been the $50 on the day that Levinson was arrested. A retainer of $200 had been paid to Messrs. Martin & Smith. This offer was refused by Mr. Hahn.
On November 10, 1879, an order was obtained by Cardozo and Newcombe requiring Mr. Hahn to show cause why he should not deliver up the papers and Mr. Newcombe be substituted as attorney. This was argued on November 14. Mr. Hahn testifies that the existence of the letters from Hawes to Levinson was referred to on this argument, and that Mr. Wentworth, the attorney for the bank, was present.
An order of reference was thereupon made to Mr. P. J. Joachimsen to ascertain the amount due to Mr. Hahn for his professional services. This order was entered on the 17th, and re-settled, and again entered on November 18,1879, so as to include an inquiry into *428 what was due Mr. Hahn from Levinson generally, and not only in the suit of the Manufacturers’ and Merchants’ Bank. The examination before Mr. Joachimsen as referee proceeded on several days, from the 20th to the 28th of November, 1879, on which last day it was stayed.
Mr. Hahn says, that on November 24, 1879, he testified before the referee to the existence of the one hun- . dred and twenty-two letters from Hawes to Levinson in the presence of several persons, among whom was Mr. McG-onigle, the deputy sheriff, who had arrested Levinson at the suit of the bank. Thus it appears that the attorney of the bank and the deputy sheriff who made the arrest, learned, between the middle and the end of November, 1879, of the existence of these papers, and they learned at the same time that they were in possession of Mr. Hahn, who was making an apparently hopeless effort to secure his reasonable fees.
Mr. Whitehead testified in behalf of Mr. Hahn, that his services in the matter of the bank were worth $500. Other evidence was given on both sides, and the referee, on December 1, 1879, made a report awarding Mr. Hahn $100, which report Mr. Hahn refused to take up, because, as he says, he considered it clearly against the weight of evidence.
The report was, however, confirmed, and an order entered on December 3, 1879, at 1 p. M., substituting Mr. Newcombe as attorney in place of Mr. Hahn. Another order of substitution was entered by Mr. Newcombe without Mr. Hahn’s knowledge, the next day.
Mr. Hahn was greatly irritated by these proceedings, which he characterizes as unfair, improper and unjust, and he was evidently smarting under the feeling of wrong done him at the time the facts now to be narrated occurred.
During the pendency of this reference, Mr. Went- *429 worth, the attorney of the bank, had a conversation with Mr. Hahn about these letters, and remarked to him among other things, jocosely, “ You are probably going out of this case and we will have to retain you as counsel, and have you try our case if Levinson drops you.” Afterwards Mr. Wentworth entertained some such idea seriously, for he wrote- to Mr. Hahn saying that he would be pleased to have any assistance from him in the Levinson case, after he had severed his professional relations with Mr. Levinson, that might be consistent with his duty. No reply was received to this letter, the date of which Mr. Wentworth does not give, but he testifies that it led indirectly to the arrangements with Mr. Hahn, or his representative, looking toward obtaining the letters referred to.
Mr. Joseph Poole, the president of the bank, testifies that a short time before the letters were copied under his dirction (which was on November 25, 1879), a stranger came to the bank in the dusk of the evening, after the lights were lit, and told Mr. Edward D. Bishop, the chief book-keeper of the bank, of the existence of these letters. This person was neither Mr. Hahn, nor Mr. Wehrman, his clerk. Mr. Bishop brought the man to Mr. Poole ; he repeated his statement, and asked if Mr. Poole thought “ they would be of service in the prosecution of these fellows.”
Mr. Poole referred the matter to Mr. Bishop. The result was that a letter was brought to Mr. Poole purporting tó be a copy of one written from Hawes to Levinson. This copy was laid before the directors of the bank, and they ordered the president to secure the letters, if possible, for the purposes of the prosecution. Mr. Wentworth, the attorney of the'bank, advised Mr. Poole what was necessary to make any copy letters he might procure admissible as secondary evidence. Mr. Poole gave ■ appropriate instructions to Mr. Bishop, cautioning him at the same time to be careful that *430 there should be no question about identifying the copies which he was to obtain.
Mr. Bishop, the book-keeper, was out of this State, and was not examined as a witness before me, and the testimony given by the Bar Association as to how Mr. Bishop obtained the copy letters and what he did with them is made up of many facts and circumstances, testified to by the respondent, George F. Wehrman, the clerk of the respondent, William H. Post, the paying teller of the bank, Joseph Poole, its president, Theodore D. Warren, its cashier, Thomas F. Wentworth, its attorney, and George D. Bangs, the book-keeper of Pinkerton’s Detective Agency, which had been employed by the bank, before Levinson’s arrest, to work up the whole matter.
Thus it appears that all the evidence on the part of the prosecution which the nature of the case permitted had to be drawn either from Mr. Hahn and his clerk, or from the officers and representatives of the bank, who were bound to shield Mr. Hahn, as far as they properly could, from the consequences of an act which, if he committed it at all, was at their solicitation. And the character of the testimony given by the bank representatives, and the evident reluctance of some of them to testify, and their manner upon the stand, are all consistent with this natural unwillingness. But putting the facts elicited from all of them together, they make a connected whole which may be narrated as follows:
Shortly after the visit of the stranger to Mr. Poole at the bank, Mr. Bishop informed Mr. Poole that he wanted $300 for the matter intrusted to him, and he received this sum in two payments of $150 each.
Mr. William H. Post, the paying teller of the bank, whose desk adjoined that of Mr. Bishop in the bank, testifies that on November 25, 1879, Mr. Bishop had a package of letters at the bank, among which there *431 was at least one of the original letters written by Hawes to Levinson. Bishop was engaged all day from ten o’clock in the morning until about three o’clock in the afternoon copying these letters. During the day Mr. Post took one or more of the letters in his hand, and recognized the handwriting of Hawes, with which he was familiar. Mr. Post could not identify more than one of the original letters among the ninety-six that were in evidence, but there can be no question that Bishop was engaged most of that day in making copies of some or all of these one hundred and twenty-two letters ; and he therefore must have had at the bank at least one of the original letters, and copies of the balance from which he made his copies.
Mr. Poole requested Mr. Post to be at the St. Nicholas Hotel shortly after three o’clock in the afternoon of that day to compare the letters with Mr. Bishop. Although occupying adjoining desks they did not go to the hotel together. Mr. Bishop left the bank at a minutes before 3 p. m., and Mr. Post followed him at ten minutes past three.
Mr. Post arranged for a private room in the St. Nicholas Hotel, and there met Mr. Bishop, who had preceded him, and who was accompanied by a strange man. Either Mr. Bishop or the stranger (Mr. Post cannot say which) produced two packages of papers, the one consisting of the original letters from Hawes to Levinson, and the other of the copies of these letters in the handwriting of Mr. Bishop. Mr. Bishop and Mr. Post spent the next two hours in comparing these copies with the originals. They marked each of the copies with the initials of their respective surnames. The stranger took no part in the comparison. The date' of this occurrence is positively fixed by Mr. Post as November 25, 1879, after refreshing his memory by referring to a notarial certificate which he attached to the copy letters by direction of Mr. Poole. After mak *432 ing the comparison with Mr. Bishop, Mr. Post left the hotel, leaving the original letters and the copies with Mr. Bishop and the stranger, whom he left together.
About this time Mr. Wehrman, the clerk of Mr. Hahn, received at the Fifth Avenue Hotel, from Mr. Bishop, an envelope, unaccompanied, as Mr. Wehrman says, by any instructions, and this envelope Wehrman delivered to Mr. Hahn. Wehrman denies all knowledge of its contents, but he admits that he had several interviews with Mr. Bishop before; and there is no evidence of what transpired at those interviews.
After the order substituting Mr. Newcombe for Mr. Hahn was made, on December 3, 1879, and at about a quarter before three in the afternoon, Mr. Hahn sent his clerk, Wehrman, to the St. Nicholas Hotel with the original letters from Hawes to Levinson, and with instructions to meet there a certain man who would know him and who would accompany him to the Ludlow street jail, and witness the delivery of the letters to Levinson. At the hotel he met Mr. Bishop, the book-keeper, and Mr. Bangs the detective, who had gone there together under instructions from their superiors. Mr. Bishop introduced Mr. Bangs to Mr. Wehrman. Ten or fifteen minutes were spent by Messrs. Bangs and Bishop examining and counting the original letters. They were numbered from 1 to 122, and Mr. Bishop said that he had copies of them. Mr. Bangs and Wehrman then went to the Ludlow street jail, arriving there at a little before four o’ clock. Mr. Wehrman delivered the original letters to Levinson in the presence of Mr.'Bangs. At the same time Wehrman served Levinson with a summons in a suit brought by Hahn against Levinson to recover his bill for professional services.
On leaving Levinson, Mr. Bangs and Wehrman went outside of the jail, and there Bangs paid Wehrman $150 in bills, which Wehrman gave to Mr. Hahn. *433 Mr. Bangs had received this $150 from. Mr. Bishop or Mr. Warren, the" cashier at the bank, for this purpose.
The suit of the Manufacturer’s and Merchant’s Bank was tried at a circuit court in the city of New York, before Mr. Justice Van Brunt and a jury, in January, 1880. About one hundred of the original letters were proved on the part of the plaintiffs, and about twenty of the copies obtained as aforesaid were admitted as secondary evidence upon the failure of the counsel of Levinson to produce the originals under notice. Mr. Hahn was present during the greater part of the trial.
Mr. Hahn solemnly denies that he had anything to do with the sale of these letters or copies of them, or had any communication with the officers of the bank or their employees in relation to the letters. He avers that the original letters were never out of his possession to his knowledge, except when he left some of them with Mr. Whitehead as counsel. To support his averment he has proved that he had the package supposed to contain the original letters with him on various occasions during the reference before Mr. Joachimsen, and especially on N ovember 24, 1879. He denies that the envelope received by him from his clerk Wehrman, contained any money. He says that he kept the letters and the copies which he had made continually in his safe, excepting at times during said reference, when they lay upon the top of his safe, and asserts that if the letters were in the bank as testified to by Mr. Post, they could only have been there by having been stolen from his office. In support of this theory he has proved the loss of certain law books by theft some time before these occurrences, and the carelessness of the janitor in charge of the building in leaving the doors of the offices open. He admits, however, that he had copies of these letters made by his clerk, Wehr *434 man, which he kept in his safe, and which he considered as his private property, and destroyed after the order of substitution was entered. Mr. Hahn alleges, in substance, in his answer that about five o’clock in the afternoon of December 3, 1879, and after the order of substitution had been entered, he received the sum of $150 for allowing a detective to be present as a witness at the delivery of the letters to Levinson, in Ludlow street jail, and he justifies this act by the wrongs suffered at the hands of Levinson as above stated. He enforces his views upon this subject in his evidence on his own behalf. He believed that the reference before Mr. Joachimsen was unfairly conducted, and that the general assignment which Mr. Newcombe procured Levinson to make was improperly obtained, gave preference to fictitious creditors, and was made for the purpose of injuring him. His account of the manner in which he was induced to allow a detective to be present on the return of the letters to Levinson is, that on leaving the court-room on the third day of December, 1879, after the order of substitution was entered, he was accosted in the street by a stranger, who was a detective, and who, referring to the letters, said it was worth $150 to him to have a person of h'is selection present on the delivery of the letters to Levinson. Mr. Hahn says he “felt mad because of the trouble he had had with Mr. Newcombe,” and agreed to the stranger’s proposition ; he does not know who the person was.
- This account does not commend itself to my confidence. It was after Mr. Wentworth’s letter inviting Mr. Hahn’s assistance, and after the letters had been in Mr. Bishop’s possession and copied by him. The various circumstances surrounding this transaction, from the visit of the stranger to Mr. Poole at the bank down to the introduction of the letters in evidence upon the trial against Levinson, form a net-work *435 so close, and the meshes o£ which are so intimately connected one with the other, that it requires more than the bare denial of Mr. Hahn to escape from its eSect: the letters were in Mr. Hahn’s possession ; he knew their importance to his client; he was angry with Levinson, and admits that he considered himself justified in using the letters to his own pecuniary advantage and to the prejudice of his client, although not in the precise manner charged. He knew that the knowledge of the existence of these letters in Levinson’s hands might be of great importance to the bank, and of equal prejudice to his client. The motive, intention and unprofessional use of the letters in one manner are all admitted. The motive was equally strong to use them as charged. The facts proved raise a presumption against him which, in the absence of any explanation on his part, must prevail over his bare denial. If he had intended to sell the copies he would have done precisely what is proved to have been done in this case. He would have communicated with the bank by some agent whom they could not connect with him. It is difficult to conceive of any person, except an agent of Mr. Hahn, having any object to apply to the bank in the mysterious way in which the stranger introduced himself. There would be no motive for any detective, or other person having these letters to sell, to conceal his name, unless in some way representing or acting under instructions from Mr. Hahn.
The subsequent occurrences all confirm the presumption that the stranger did represent Mr. Hahn. After some preliminary bargain between the stranger and Mr. Bishop the former left with the latter a copy of one of Hawes’ letters. When the bank agreed to his price he produced one of the original letters, and copies of the balance. He would not trust all of the originals out of his hands. They remained in Mr. *436 Hahn’s ■ possession, were taken by him to the reference before Judge Joachimsen, and displayed so as to allay suspicion.
When Bishop had made copies of all the letters it became necessary to compare them with the originals. Then the letters are found in the possession of a stranger, at the St. Nicholas Hotel, who appears to have been acquainted with Mr. Bishop but unknown to Mr. Post, and who stood by silently while Mr. Bishop and Mr. Post compared and put their initials upon the copies. After this was done, Mr. Post retired, leaving the original and copy letters with the stranger and Mr. Bishop, and the next that is known of the lelters is that they are in Mr. Hahn’s hands, and of the copy letters that they are in the possession of the attorney of the bank ; and for his participation in the matter, Mr. Hahn received $150 from the representatives of the bank.
These presumptions are strengthened by the fact that Mr. Hahn destroyed the copies of the letters in his possession, after the order of substitution, which up to that time he had kept in his safe, and which may have been the papers which Mr. Bishop had at the bank, and might have been identified by Mr. Post or some other person who saw them. And the fact that the originals and copies were kept in Mr. Hahn’s safe, excludes the idea that they were copied by any one without his consent.
I am constrained to find, from all these circumstances, as a fact, that the copies of the letters put in evidence upon the trial were obtained by the bank through the procurement, contrivance or connivance of Mr. Hahn. When papers of this valuable character, upon which the liberty of a client depends, are entrusted to counsel, it is his duty not only to return them when the relation of counsel and client ceases, and to observe the secrets confided to him with abso *437 lute fidelity, but also to abstain from willfully doing or saying any act or thing through which such papers or the knowledge of their existence can be used by any one to the prejudice of his client.
It is quite immaterial, from this point of view, whether the wrong committed by Mr. Hahn was before or after the order of substitution. It is unnecessary to define the limit of the obligation of counsel to their former clients, but it is clear that duty of fidelity and secrecy is not extinguished by the substitution of other counsel. I cannot assent to the proposition maintained by Mr. Hahn, that the order of substitution terminated his obligations to Levinson.
Some part of the testimony admitted was received under the objection of respondent’s counsel that it was inadmissible, because the respondent was not present when the events testified to occured. Although, in some of the instances referred to the respondent was not. present, the facts testified to were all part of the res gestee, and the results followed the facts with such logical precision, and in such chronological order, as to produce, in my judgment an overwhelming amount of circumstantial evidence which is admissible under the rules governing this kind of testimony. If, however, all such evidence is disregarded, and the case rests upon the answer and admissions of Mr. Hahn, he is guilty, in my opinion, of a grave breach of professional duty in permitting a detective, for a valuable consideration, to be present, under the circumstances of this case, when the letters were delivered to Levinson.
I cannot make any great distinction between the gravity of the offense charged and that which Mr. Hahn admits. He knew better than anyone else the importance of these letters to the bank. He knew that they were of no value to anyone but the bank, Levinson and Hawes. He says that he judged the stranger who accosted him in the street to be a detective of the *438 Pinkerton agency, “ employed in the matter.” He must have believed, therefore, that the stranger was an agent of the plaintiff bank.
The arrangement which was made between him and this detective was such as to have suggested to the mind of any professional man that this part of the transaction was a necessary link in the chain of evidence forging for Levinson.
Unless the original letters could be proved to be in Levinson’s possession, copies could not be admitted. It was just as important to the bank to have a witness to the delivery of the letters to Levinson, as it was to have copies of the letters. And, in my opinion, Mr., Hahn is almost as culpable in furnishing proof of the delivery of the originals, as he would have been had he furnished the copi.es. Neither were of any value except as evidence, and each was valueless without the other. Mr. Hahn’s fault in volunteering this necessary link in the evidence, for a consideration, is none the less grave because he might have been compelled by the bank to testify on the trial as to the existence of the letters and in whose possession they were, or because these facts might have been proved by others (Brandt v. Klein, 17 Johns. 335). The charge is not against the bank in procuring the testimony, but against Mr. Hahn for voluntarily making it admissible. In my opinion, Mr. Hahn’s conviction that he had been wronged, supposing it to be just, affords no justification for his actions, and can only be addressed to the clemency of the court in mitigation of the severity of any penalty which might otherwise be imposed upon him.
I report, therefore, that Mr. Hahn is subject to such discipline as the court may determine, in view of the mitigating circumstances he has alleged, and the evidence of previous good character he has adduced.
The court will give due weight to these circumstances, and also to the fact that Mr. Hahn was deal-! *439 ing with a man whom he had good reason to believe to be a scoundrel who ought to be convicted, and the wrong done by Mr. Hahn did not prejudice the cause of justice, but rather his own character, and the honor of the profession to which he belongs.
The General Term, November, 1882, adopted these conclusions and ordered the respondent to be disbarred. The following opinion was delivered :
Brady, J.
The report of the learned referee in this case presents clearly the charges made against Hahn, and the proof by which they are sustained. The conclusions of fact at which he arrived are justified by the evidence, and there is no doubt that Hahn, either deliberately or impulsively, instigated by wrongs done him by his client, has been guilty of professional misconduct, for which there is neither justification nor excuse. The secrets of professional life are sacred, and the revelation of them to an adversary, unless forced by law, is the betrayal of that confidence which forms the basis of the relations between attorney and client—the very foundation, sacred, honorable and honored, on which their intercourse rests; with which nothing can be allowed to interfere.
If in the form of letters the intelligence is conveyed, and the advocate is not paid for his services, he may retain them until his claim is adjusted ; but it is just as sacred from publication in any way as if there were no dispute. The lawyer knows this to be the controlling element of his professional life, and when* he discards it does so at the peril of his license and his honor. When he perpetrates a falsehood to escape the consequences he increases the magnitude of his oifense, if it is possible to do so, and he forfeits all merciful consideration.- For these reasons the order must be ehtered disbarring F. S. Hahn.
Davis, P. J., and Daniels, J., concurred.